Okay, we've got a tag team over here, right? Tricia, or Ms. Tesmer, you're... May it please the court. Good morning, Your Honors. Good morning, Council. My name is Tricia Tesmer. On behalf of my client, appellant, defendant, Dr. Moran and his group, ECHO Management, which is an emergency room physician group, along with my co-counsel, Nancy Lisher, who's here on behalf of the hospital, defendant St. Mary's. I plan to argue as we did with the briefs. Ms. Lisher will cover the apparent agency issues, and I'm prepared to answer questions regarding the remaining of the remainder of the brief. We're here today because the trial court abused its discretion in failing to allow the jury to hear the full story regarding Ms. Koenig's presentation in February 2006 for three main reasons. Barring the evidence of subsequent treatment, a day and a half following the admission in question was an error, which was further exacerbated by my second point, the allowance of layperson testimony about the fact that they believed that this was chicken pox. And finally, the third point, after confusing the jury as to the medical condition and what the rash presented like, the trial court further impermissibly permitted plaintiff's counsel to discredit defendant's only proximate care expert with improper standard of care questioning. Along with the other points in my brief, the trial court erred and a new trial, or alternatively a remitter, should be entered. Pertaining to the subsequent treatment, the jury missed an entire chapter of what occurred in this woman's presentation. The story was built up, how she was diagnosed with MS in early February 2006, and then presented to an emergency room, and then a week later presented to our emergency room and saw Dr. Moran. What was left out of the picture was that this patient was then seen by an infectious disease specialist, her family practitioner who had seen the patient a month before, a neurologist who had seen the patient a month before, and an infectious disease specialist. The defense was precluded from allowing this evidence pertaining to what the rash looked like. The subsequent treatment goes to the heart of the issue, and the issue is, did Dr. Moran diagnose varicella zoster, otherwise known as chicken pox? It's not a simple chicken pox presentation where a person comes in just complaining of a rash over the body. Ms. Kernick came in with a history of, in early February, just being diagnosed with MS, having gone to Riverside Emergency Room with slurred speech, and being seen by her internist, Dr. Trapp, and neurologist, Dr. Doet. That was February 9th and 10th. From February 11th to the 14th, she went to a specialized center called CINN, C-I-N-N, for workup and treatment of her multiple sclerosis. Five days later, on February 19th, she presented to St. Mary's and my client, Dr. Moran, with a chief complaint of back pain and neck pain. There was also an incidental finding of a rash, which Dr. Moran noted, but the rash was not the only thing going on. The patient was discharged home after the back pain had resolved with a plan to see her internist, Dr. Trapp, who she'd just seen the day before, and also the CINN group, who had just seen the patient. What was left out was the very next day, on February 20th, and through the 21st, the plaintiff was seen at Riverside by Dr. Trapp, her internist, an internal medicine physician, who did both a history and physical, and noted red, slightly raised rash, but was not concerning to him. He did not diagnose chicken pox. He did not diagnose disseminated varicella zoster, and he did not diagnose that this patient was immunosuppressed. Dr. Trapp saw the patient before and after Dr. Moran. The patient was also seen by an ER physician, Dr. Manchenko, who did a CBC and a CAT scan, and noted that the patient's primary complaints were abdominal and back pain. He was trying to rule out an abscess of a lumbar puncture, and he did not note any significant skin lesions. So this is now a second physician who saw the same rash, and did not diagnose it, and could have testified as to what this looked like. Third physician, Dr. Romani, was an infectious disease specialist, who also did a history and physical of the patient a day after my doctor saw the patient. He did a CBC and liver enzyme test, and noted that she was, again, complaining of back and abdominal pain. He did not make a diagnosis of chicken pox, and he did not prescribe Aclovera. And he did comment that he was not prepared to testify against an emergency room physician. And finally, Dr. Doat, a neurologist, also did a history and physical the following day, and did not consider systemic herpes in his diagnosis, which chicken pox falls under. And he was not, he was more concerned about the rash being part of an infection than he was chicken pox. Ms. Tesmer? Yes. I just need a little bit of clarification. Dr. Doat appeared at St. Mary's on the 19th. Correct. She was then taken to Riverside on the 20th, and she was there the 20th, and then the 21st she was airlifted. Is that correct? On the 21st she was airlifted, and she died prior to getting to the next hospital. Okay, and my point of clarification is that a couple of times in your brief you talked about it was two days before the doctors had seen Ms. Tesmer, and it was a day and a half. And I don't know, it's looking to me like it's one day. The timing in the testimony, it's about a day and a half. I think I was generalizing when I said two days, because the time of death was unclear when I was writing the brief. But it was a day and a half. She was discharged on a Sunday night. She went into Riverside the next day on the 20th, and was at Riverside for a little over a day. I don't know how much, but in that time she was seen by infectious disease specialist, neurologist, an emergency room physician, and her internist, two of whom had seen her prior to my emergency room physician seeing her. But that was all within like 36 hours or less of when she was seen by Dr. Moran? Correct. Thank you. But this is particularly important because they're looking at the same rash that Dr. Moran saw on the 19th. At the heart of liability is how this rash presented, and evidence is relevant if it tends to prove a fact in controversy or render an issue more or less probable, according to Bullard v. Barnes. This rash was an evolving process, and it made plaintiffs entire standard of care testimony less probable as to what this looked like. This was further exacerbated by the lay testimony. Not only were defendants not allowed to present medical testimony that four specialists did not think that this presented as chickenpox, but then plaintiff was allowed to have lay this rash looked like chickenpox. It seems absurd that three lay people can testify that something is chickenpox and defendant hands are tied and can't defend himself when other physicians looked at this very same rash and thought the same thing that he did. Is a paramedic really a lay person? I did separate that in my brief. The paramedic is more of a lay person in this situation because the paramedic conceded that Ms. Boomsima was not trained or qualified to give a medical opinion, to diagnose, and that's what this is. By calling it chickenpox, whether you think it's chickenpox or looking at chickenpox, you're making a medical diagnosis. In Robinson, the court held that you can't, a lay person cannot make a diagnosis or name a medical condition. It's proper to describe the symptoms, but it's improper to diagnose the condition. In that case, it was improper to say an increased blood pressure or angina. The layperson testimony could only go so far as to describing the symptoms in a lay way. Here, they could have described red bumps. They did not need to go so far as to call it chickenpox. That is a diagnosis in a condition and was exacerbated by the fact that our hands were tied that the subsequent treaters couldn't talk about it. Finally, the question of standard of care as to our approximate cause expert finally sunk the ship for the defense in this case because our standard of care had been questioned because plaintiff was allowed to show everything about the rash presenting as chickenpox and the defense was not allowed to show what it thought the rash presented as. The only other element is approximate cause and our expert was disclosed as standard of care only. This was outside the scope of cross-examination and was only done by plaintiff to discredit the opinions of our causation expert who was there to testify that the day that Ms. Kernick presented to Dr. Moran at St. Mary's, her varicella zoster could not have been treated with Aquavir at this point. That was our approximate cause argument and our expert was discredited with completely improper testimony regarding standard of care as he was only disclosed in his 213 opinions as to causation. Just to work through on that last point, your expert would have said that in essence she was terminal by the time she got to your ER. That was our infectious disease expert's approximate cause testimony, yes. May I briefly conclude, Your Honors? In conclusion, I respectfully request that this court reverse the trial court's finding and grant us a new trial or alternatively a remitter of the $1.5 million verdict. Thank you. Ms. Lisher. Good morning, Your Honor. Counsel. I of course do join in my co-defendant's arguments and I do represent Ravina. The facts as to agency are pretty straightforward and I know you know them, but just to quickly reiterate them. This was an adult patient who signed a consent that said multiple times that she may be treated by an independent contractor who would be solely responsible for her care. It said the hospital is not supervising, cannot control the independent physicians and it disclaimed any reliance on the hospital and says she didn't pick this hospital because of the physicians. Now at trial, the mother said, I picked the hospital and I relied on it for what it was instructed, not that the plaintiff had to prove what the patient knew or should have known about independent practitioners and not what the patient knew relied upon, but was told that the mother, the mother's knowledge was only the relevant part and that the mother didn't choose Dr. Moran but relied upon the hospital. We have two alternative arguments. One is J&OV because we think the only evidence in this record is the consent and under Wallace and Cherokee that sufficed to put what the Supreme Court has said, put the patient on notice that there would be independent practitioners, not employees of the hospital. But today I'd like to focus on the jury instruction because on appeal the plaintiff argued, well this is a fact question and the jury involved the issue of agency. But the problem with this is the trial court erred. He withdrew from the jury's consideration this consent because what he said was and the jury was instructed that what the patient knew or signed or relied on wasn't relevant. Only the mother's knowledge and reliance was relevant. Let me just, I mean I get your argument, but let me just ask you, supposing the instruction is wrong, but is there, in light of the way this document, the consent was worded, does it still leave a question of fact as to the apparent agency even, let's assume the instruction is wrong. But is at the end of the discussion, or even if it's what the patient knew, is there a question, is there a jury question? I don't think there is a jury question, which is why we asked for J&LB. These cases, Wallace and Cherokee have said summary judgment is proper, it's a standard. Your consent says most, it doesn't say most physicians? And that's what Cherokee said. Cherokee said, I think it was Sherman Hospital, Sherman Hospital utilizes independent practitioners. So in that form, we're also very similar to the Wallace consent, because that said, there were nine sections and it repeatedly said, you know, this is for your consent for treatment, liability for valuable, there were various subsections. That's one thing that the opponent has raised, saying, well, this consent was, you know, confusing. But the answer to that is, in Wallace and Cherokee, those consents were held as a matter of law to be proper. But in any event, by telling the jury that only the mother's knowledge and reliance counts, the jury would have no reason to look at the consent. The mother testified, I didn't read it, and the jury was told, only the mother's knowledge counts. And this error was compounded when the plaintiff argued to the jury, now you'll be instructed that only the mother's state of mind counts. And the jury wouldn't even look at the instruction. So I think as a matter of law, the instruction suffices for J&OB, but in the alternative, the jury never had this consent. I mean, it wouldn't have looked at that piece of evidence, because that's not what the jury instruction said. And that's why it's reversible error. Are there no other questions? Thank you, Your Honor. Thank you. Mr. Rasek. Good morning, Your Honor. I'm Michael Rasek on behalf of the plaintiff, Apple Lee, who is the mother and representative of the estate of Michelle Kennedy, the young lady who died here. With respect to the position of the doctor about the admissibility of the evidence of the care of the next date, if the court reads the arguments about whether the defense should be what happened at Riverside the next day or two days after that, what counsel was really asking the trial court to do was to admit that evidence of what happened the next day as evidence of the standard of care. That's the argument that I read when I read about the trial court judge. And of course, whether or not a doctor the next day violated the standard of care isn't relevant to whether this doctor violated the standard of care on this day. If somebody else runs the stop sign out here 10 times over today, tomorrow, the next day, I can't say, well, Your Honor, everybody else ran the stop sign. It was okay for me to run the stop sign. It's just not the law. But is it relevant that three doctors, three physicians, see him the next day and none of them, in essence, the violation of standard of care, as you say, was the failure to diagnose three physicians, see him the next day, and they don't diagnose chickenpox. Is that relevant? I can conceive of a problem that they have in this case, Your Honor, is that, I'm trying to remember the page number, I think it's page 1153, their own expert said that the rash the next day was not the same. The rash that the doctors looked at at Riverside the next day was not the same appearance as the rash that Dr. Moran saw at St. Mary's Hospital. But if it was chickenpox, it would still look like chickenpox. Well, the doctor said the rash did not look the same. The reason it did look the same is because the next day she just did not only have chickenpox. By the next day, all the testimony was she was in complete liver failure. That doesn't, that produces a potentially different set of symptoms. There's no offer of proof that ever came in that said the rash the next day was, in fact, the same appearance as the rash on the day she was seen there. That's medical testimony that would be needed. It's not there. How could a physician that didn't see her on both days say the rash didn't look the same on the second day? I would think that the doctor would probably be able to look at the chart. The point is, though, that nobody did say that. There was no question, their own expert admitted that the rash looked different the next day, and I'm assuming he made that representation because he's an expert in infectious disease, and he knew the chicken, he knew that somebody who was in liver failure the next day is going to have a different appearance of rash. Well, most of us have had chickenpox, and most of us have had kids with chickenpox. Yes. And we all know that chickenpox doesn't always look the same on day one as it does on day two, and three, and four, and five, you know what I'm saying? That doesn't mean it still doesn't look like chickenpox. Except that here, no one said that the rash the next day, no one and didn't know it was chickenpox. We're looking at something that should have told them it was chickenpox. I've tried to be a little bit more specific on that. We've got two appearances on two days. If we applied late testimony to it, it might be different, but I'm suggesting to the court that the appearance of chickenpox does change day by day. That was the testimony. That was Dr. Moran's mistake. He did not understand how it would change day by day. So although all of us think we know what it looks like, when it comes down to looking at it from day to day, one, two, three, four, apparently, at least my memory, from what I've read here, wasn't so good, because it does change from day to day. It starts out as one form and moves to another form. Dr. Segretti said the next day it didn't look the same as it did the first day, and the implication was it didn't look like chickenpox. The bottom line is, if they missed it the next day, why did that mean that Dr. Moran should not have been obligated to diagnose it his day? Nobody said it was confusing the next day as it was his day. It still comes back to what is the standard of care? And the standard of care, everybody agreed, required Dr. Moran to diagnose chickenpox that day. And if the doctors the next day did not diagnose chickenpox, and there was, we settled, I believe we settled as to, or dismissed those people, there was some testimony initially that the doctors the next day missed the diagnosis as well. My point is simply it doesn't matter. The fact that somebody else made a mistake doesn't mean that I did not make a mistake. That somebody else was confused doesn't mean that I should have also been confused. I guess maybe that's the way I'm trying to put it, Judge. Yeah, but you, what about the lay test, lay diagnosis? And that, I think I can do that in under 60 seconds, Judge. They didn't diagnose. They said it looked like chickenpox. And I just go back to what Your Honor just said. We've all seen it. We say it looks like measles. It looks like you have a cold when your nose runs. They weren't saying it was chickenpox. They just said it looked like chickenpox. Well, apparently one of your witnesses said that she'd never seen chickenpox. The friend. She, that's right. I think she'd, she'd never, I think the gist, and it's a little unclear if the admission was, she hadn't actually looked at somebody where somebody said, that's chickenpox. But we've all, we've seen it, we've seen it on shows, on TV. I think everybody knows what we think chickenpox looks like. We've heard about it. We know what measles looks like. I get it. It gives you little red spots. There are things that we know. And the first time the question came up about whether or not it looked like chickenpox, there was no objection. So if there was any issue, it was waived anyway. Everybody seemed to agree it looked like chickenpox. Even the ambulance drivers indicated it looked like chickenpox. Nobody said it was. The only time anybody said it was chickenpox was when counsel made a mistake in closing argument and the judge, he apologized. There was no objection to that. That's how significant it was. Counsel got carried away in closing argument and said, those people said it was chickenpox. There was not even an objection there. It's just so harmless. Later in the, after the closing argument, the judge came out and told the jury to disregard that. So it simply wasn't an issue at that point. As to the hospital's case, if I can turn to that, from the, just a few questions, obviously the court, I think, understands our position. It's a form that has the same defects that the form did in the Spiegelman case. It's long, it's got, it covers all types of areas. It's not even the same size print that I have to give this court in my briefs. It doesn't say all our doctors. And James, I think, has a better form. The new Lamb case that they cited in their reply has a better form. It says, none of these doctors work for us, are employed by us. In this case, it simply said, most of these doctors are not our agents. I'm not sure that somebody coming into an emergency room would understand that anyway. But most doesn't tell me whether the one treating me has. And, and the form itself goes on to delineate your doctor and other doctors. Your doctor and emergency room doctors. The form itself kind of separates emergency doctors into a separate category. And I think to a normal person would say, they're employees. Your client didn't have any of those problems, because she didn't read it. She did not, Michelle did not read it, nor did Rita read it. The mother, correct. I guess recognized in both in some way being the client's. Nobody explained to her what was in it. Nobody told her what the significance of it was. If she had read it, would she be bound by it? The fact is that she chose, all the evidence is that she chose this hospital. I'm sorry. She selected this hospital. Everybody knows she did not select Dr. Moran. She didn't know who found her. Who is she? Who is she? I'm sorry. I apologize. The mother, Mrs. Steele, is the one that selected St. Mary's Hospital. She does not, Rita Steele did not know who Dr. Moran was. According to the York case and Dillard case, once you select the hospital and you don't know who the doctor is, you've not relied upon the hospital. That should be the end of the reliance on the hospital. I'm sorry. No, no. I'm sorry. Her testimony was that she always chose St. Mary's because she had faith in it. Correct. But they went to Riverside the day before. They went to Riverside the day after. Correct. And my point there, Your Honor, is that the two times where the evidence shows that Rita Steele selected the hospital, she chose St. Mary's. The other two times when her daughter first went there when she had the MS and then the following, at the end when she went there, there is no evidence that the mother chose anyone. Someone simply took the daughter to Riverside. And so the only evidence, and nobody asked the mother, did you pick Riverside the first time and did you pick Riverside the last time? I presume they did not, these are not incompetent counsel on the defense side. I assume they did not ask the mother, did you pick Riverside? Because they probably knew what the answer was. She did not. Somebody called an ambulance and they took her there. So the only time the mother made a choice was this time. And there isn't any doubt that, there's no contradiction or no controversy that the mother picked St. Mary's this time. Well, have you ever seen any case where the relevant state of mind was, with respect to a parent agency, was that of someone other than the adult patient? Yes sir, in two cases. One would have been the Montre case that we cited where the ambulance drivers made the choice. I'm relatively sure that was an unconscious person. If you're unconscious, somebody's got to take you to the hospital. But this patient was conscious? Was conscious. And the other case, then I can cite to the court, is the York case in the Supreme Court, where the Supreme Court implicitly said it was okay in the York case, said the court, for the father doctor was the patient and the hospital wanted to argue that the son made the choice. Could this have a more informed patient than a father who's a doctor? But the Supreme Court said it would be, it was okay for the hospital to tell the jury that the son made the choice. And that surely implicitly holds that somebody besides the adult can make the choice. I'm not sure, I'm not sure why. The son was an adult, was he not? He was correct, he was correct. So they said even though the father doctor did it, they said it was the son who was the patient who made the choice. I'm sorry, it was the father who was the patient. It's the same concept. The father was the patient, but the hospital wanted to argue that the son made the choice. And the Supreme Court said, that's fine, you can, the hospital did argue that the son made the choice. So you have a scenario where the Supreme Court is approving a situation where someone who is not the patient is making a choice, arguably, for a patient who is an adult and conscious and competent. That's our situation. The evidence in York showed, or at least strongly suggested, that the son was the agent of the father, that the father had asked him to do this. We don't have anything like that here. No, we do not. But I go back, that wasn't, at least to my understanding, that wasn't the critical step there. The question was simply who made the choice, not by what virtue did you make the choice. And nobody has argued here that the mother, there's no law anyplace that said that one person can't make the choice for the other person. I think that's what the hospital's trying to tell you, that only the patient can make the choice. Well, we have all kinds of elaborate things in the state of Illinois for agency, for medical purposes. Correct. We don't have anything like that here. We have a patient who is adult and conscious and apparently able to describe her symptoms to the doctor. Correct. What's the evidence that the mother was the agent for any purpose? Because the mother simply made the choice. Well, really, that's not, she did it and does she not have the right to do it? Wouldn't it be more correct legally to say that the daughter made the choice? If I was a kid, why'd you do that? Hopefully it's safe, because my dad told me to. So really, isn't what you have here an adult making a decision based upon her mother's preferences? But still her decision, there's nothing, there's nothing in here that said the daughter couldn't make it. It was like incompetent, you know, underage, for whatever reason. So really, don't you have an adult making a decision, maybe based on her mother's strong preference, but isn't she the one making the decision legally? I think legally, did she decide it? By default, I guess I would have to, I'm trying to think of a way to phrase it. By default. Ratification. She ratified her mother's decision, she didn't object. She didn't agree to it. By default, she allowed her mother to make the decision. But there's no law that says, there's no rule that says I can't by default simply allow somebody else to decide. It's not a question of what medical care I get, where I go for the medical care. I think that's a little bit different than the power of attorney that Your Honor is talking about. In this situation, the choice is simply, where do we go for medical care? My mother took me there. If we had Michelle back today, she probably would say, I would have to admit, why were you there when my mother told us to go? But that does not... She could have said it was fine with me. She could have. Could she sue her mother for her mother making that choice? No. You were the one that made the choice to send me to these people that I think. No, of course not. What if it wasn't her mother, let's say it's her friend in the same situation, and she said, well, you took me there. Wouldn't the response be, well, you're an adult, you were conscious, you agreed to go. But you couldn't possibly sue somebody for that recommendation because there's no legal basis for it. If I rely upon you to take me there, then I should be bound by your decision to take me there. It's basically one speaking for the other. I guess the question is, what's the authority for the jury instruction? And the authority for the jury instruction is that the plaintiff's position was that the mother made the choice. If the hospital wanted to argue that the daughter had some influence in the choice, they could have argued that. But the problem here is that there isn't any such evidence. Nobody brought the evidence out. It's not like your case where you could ask the patient because the patient was still around. But we don't have any evidence to contradict that. If the hospital wanted to argue that the daughter here implicitly ratified her mother's choice by not saying anything, they could have argued that. But that still wouldn't have cured the problem because the problem is that everything they're doing is relying upon a consent form that arguably isn't any good. I'm sorry. We've been peppering you pretty good. But the mother didn't sign the consent. Nobody asked the mother. That's correct. And arguably, if they have somebody there, why doesn't the hospital have the person who made the choice to come here? We have a daughter who's not just sitting there because she's got a sore throat or a runny nose. According to the evidence, she has terrible, terribly severe screaming pain and wasn't in any condition, as we could imagine, to do anything. If you're somebody in the hospital, if you really want to stand on these forms that nobody ever reads, you really need to ask, why aren't you here? You really need to do an inquiry on the hospital's part. If they want to use the form, use it correctly. I guess that's what it would end up. If you're going to give them a form, it didn't matter who signed this form. It was not going to tell you that Dr. Moran was not the hospital's employee. It doesn't say that. It says most, but not all. It doesn't tell you how to choose. With the total shelf, we tell the mother. Obviously, I'm going to pass my time, unless the court has some further questions of me. But obviously, it has to come from the court. Thank you, Mr. Ratzak. Okay, reverse order. Ms. Lisher, I guess. That is reverse order, if that's all right. Your Honor, in York, the instruction, and I think Justice McDade, you know, splits the authority. In York, the jury instruction said, you have to consider what the patient knew or should have known in the reliance. There was lots of testimony about what the Sutton had done here and there. And the hospital, because the facts were somewhat reversed, wanted to say the patient or others. And the Supreme Court said, no, this instruction is proper, because it's the plaintiff's. Was the plaintiff on notice? Did the plaintiff know or should have known? And the Supreme Court said, look, if the jury decided the son, in fact, had selected, then the instruction is correct, because the jury would come back as a not guilty. In this case, the jury instruction erased the consent out of the equation. Justice Schmidt, as you said, well, if the mother's going to start making all these decisions, and if there is ratification, and then, I mean, if you're going to start applying those kinds of principles, well, I think the consent should have been handled by the mother. I mean, if we're going to make this an issue, then make the plaintiff plead and prove agency between the mother and the daughter. Let's get the consent in front of the jury. Let's get all the evidence there. This consent did, by the way, say that the independent practitioners are not employees. That's a very easy concept for everybody to understand. Just in conclusion, she did have the opportunity to read it. Mr. Rassak says, well, nobody reads these. I don't know. I've been reading these long before I went to law school. I've changed them since I was probably 18. So to say, well, nobody reads them. Well, that's not an excuse. The bottom line is adults in Illinois are expected to understand what they sign off on, and that's equally true in Med-Mal cases. For these reasons and the reasons in my brief, I would ask this court to reverse. Thank you. Thank you. Ms. Tasman. Your Honor, plaintiffs argued that defense argued standard of care in regards to the subsequent treatment, which is not entirely true. Defendants, in exasperation, argued a whole lot of things in trying to get that subsequent care testimony in. And I think, Justice Schmidt, you hit the nail on the head when you noted that chicken pox is chicken pox, and we're talking about an evolving process of the same rash within a matter of days. Defendants were precluded from presenting medical testimony, qualified medical testimony about what this rash looked like. Plaintiff would have you think that this is akin to cases where you're looking at something entirely different. It's not a separate rash. It's unrebutted that this is the same rash and that it's getting worse as she died from it. This is not something that was treated and is getting better, so the subsequent treating testimony would have less relevance if they're looking at something that is improving. But instead, they're looking at something that is evolving and getting worse. This is an extremely rare condition. Plaintiff presented to the emergency room to Dr. Moran with a history of already having chicken pox. And her primary complaint, as plaintiff just stated in arguing the apparent agency issue, this woman was in excruciating pain. She had back pain, and that was Dr. Moran's primary concern. In looking at the rash and trying to decide what to do with it, that's the issue against Dr. Moran. Did he or should he have properly diagnosed this as chicken pox? And what this rash looked like is at the heart of the matter. Defendants were precluded from presenting subsequent treating testimony and plaintiff was allowed to give lay testimony. As Justice McDade properly pointed out, one of the lay witnesses hadn't even seen chicken pox before. The mother was a lay witness not qualified to testify as to a condition, and testifying as to a condition rather than symptoms is entirely different. And with respect to the lay testimony, is there a qualitative difference between a lay person saying it looked like chicken pox as opposed to it was chicken pox? I contend that there is no difference, Your Honor. The trial court made the distinction and told plaintiff's counsel they can't say it is chicken pox, but they can say it looked like chicken pox. But if you look at the case law, the case law is clear that a lay person is not to give medical testimony, is not to give a diagnosis, and saying something looks like chicken pox is saying that it is chicken pox, especially when there's an alternative. You can describe it. You can say it's red bumps. You can say it's raised, if it's blistered, if there's pus, if there's bleeding. There's many ways that a lay person can describe what they're seeing without tying a medical diagnosis to it, which is so crucial to this case because the medical diagnosis is the key issue against my client. Was this chicken pox? And you've got lay people saying this is chicken pox, this is chicken pox, this is chicken pox, and my client can't show that an infectious disease specialist, an emergency room physician, the patient's own family practitioner, and a neurologist a day or up to two days later did not diagnose it as such. The jury missed an entire chapter of this story, Your Honors, and the defense was prejudiced by not being allowed to present evidence of subsequent care, especially in light of the fact that this lay person testified. Therefore, Your Honors, we respectfully request that you reverse the trial court and enter a new trial or in the alternative a remediator of the $1.5 million loss to society as this is outside the range of what is fair and reasonable compensation as the jury verdict was inflated due to the unqualified and cumulative expert testimony, the unqualified opinion testimony, and the improper cross-examination of defendants, approximate cause expert, and the total absence of evidence of subsequent treatment. Thank you, Your Honors. Okay. All right. Well, thank all three of you for your arguments here this morning.  Right now, the court will be in recess for a panel change before the next case. Court is now in recess.